```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION


Ruperto Samuels,                       )
                                       )
         Plaintiff,                    )
                                       )
                                       )
      v.                               ) Case No. 15 C 8468
                                       )
                                       )
Schneider National Carriers,           )
                                       )
         Defendant.                    )
                                       )
```

## Memorandum Opinion and Order

Plaintiff Ruperto Samuels was hired in July of 2012 as a Regional Safety and Training Manager for defendant trucking company Schneider National Carriers. His job duties included facilitating periodic safety meetings and driver training programs for newly hired drivers who flew to Chicago to attend programs at Schneider's training academy. In March of 2014, while plaintiff was off work due to a work-related injury, one of his subordinates voiced a suspicion that plaintiff had been misusing the company's "fuel card" for personal purposes. (The fuel card was normally used to purchase gas for a corporate van that shuttled drivers to and from the training academy.) After plaintiff's supervisor, Dan Drella, investigated the suspicion, defendant engaged an outside investigator to question plaintiff about his use of the fuel card, as well as about a balance Drella discovered plaintiff was carrying for personal expenses on

his corporate American Express card. At the close of the interview, the investigator offered plaintiff two options: either he could sign a pre-printed resignation letter, in which case defendant would forget the suspect fuel purchases and pay off the American Express balance; or he could choose not to resign, in which case defendant would pursue criminal charges against him for theft. Plaintiff signed the letter, then filed this lawsuit under Title VII of the Civil Rights Act and Illinois state law. He claims that he was discriminated against based on his race, and that he was forced to resign in retaliation for complaining about race-based harassment and for filing a workers' compensation claim for his work injury.

Defendant has moved for summary judgment on each of these claims. For the reasons explained below, I grant the motion.

I.

The facts recounted here are undisputed except where noted.[1] Plaintiff is an African-American man of Cuban origin. His first year-end performance review as Schneider's Regional Safety and Training

---

[1] Some of the facts are drawn from my own review of the record, since many of the parties' L.R. 56.1 submissions—which incorporate legal argument, evidentiary objections, and lengthy non-responsive remarks—veer far afield of the letter and spirit of the Local Rule. As I have observed on several occasions, L.R. 56.1 is intended to facilitate the ascertainment of factual disputes. *See, e.g., Grabianski v. Bally Total Fitness Holding Corp.*, 169 F. Supp. 3d 785, 788-89 (N.D. Ill. 2015) (citing cases). When parties populate their submissions with objections and arguments rather than with "concise" factual statements and clear citations to competent evidence, they subvert the rule's essential purpose.

Manager, which was completed by his then-supervisor Kris Maczollek, was positive. In August of 2013, plaintiff began reporting to Dan Drella, who met with plaintiff on several occasions in late 2013 and early 2014 to discuss the high number of crashes in the Chicago region and strategies for improving defendant's safety results.

On one such occasion in November of 2013, Drella directed plaintiff "to take specific steps to help reduce the number of crashes." Samuels Dep., Exh. 1 to Pl.'s L.R. 56.1 Stmt., 137:24-138:7. At another meeting the following month, Drella gave plaintiff "a list of items that [he] needed to do or make sure were done," including catching up on training and keeping training current; conducting post-incident reviews within 48 hours; improving "the depth of analysis" plaintiff provided to Chicago's operations manager; and "delegat[ing] better." *Id*. at 140:12-25, 141:11-142:2. And at a meeting in February of 2014, Drella identified additional steps he wanted to see plaintiff take to reduce crashes, including a "strongly increased field visibility." *Id*. at 148:6-9. Drella reinforced the visibility point in an email he sent plaintiff on February 19, 2014, telling him "that instead of working at home he wanted [plaintiff] to come into the operations center to be visible and to talk to drivers" because he "believed [plaintiff's] presence in the Chicago operations center was important." *Id*. at 151:20-152:4.

Drella states that plaintiff "struggled with his job responsibilities," and that he instructed plaintiff "to be more proactive...to get out into the yard, go out on the rail ramp, watch the drivers and see where they were having crashes" and "to stay on top of training." Drella Decl., Exh. D. to Def.'s L.R. 56.1 Smt., ¶¶ 4, 5. Plaintiff agrees that the number of crashes in the Chicago region was too high and that Drella instructed him to take certain steps to improve the region's safety results, but he disputes that the poor safety results reflected any shortcomings in his own performance. In plaintiff's view, "there were certain things that [Drella] wasn't really aware of," *id*. at 148:23-24, and he believed that Drella "was giving [him] directives for things that [he] had already completed," *id*. at 150:14-17.

On February 19, 2014, plaintiff called Angie Sheedlo, defendant's Human Resources Business Partner to complain about Drella's supervision. At his August 25, 2016, deposition, plaintiff testified that he did not recall what was said during that call. He stated, however, that an email he sent to Sheedlo the following day accurately summarized their conversation. *Id*. at 153:4-5, 17-18. The email states:

> As I stated in our conversation yesterday I believe that I am being set up to fail. In every conversation with my leader [i.e. Drella] there has been the tone focusing on our current safety results being negative as due to something that I am not doing.

Def.'s L.R. 56.1 Stmt., Exh. I. The email continues,

> my perception of my leader's attitude towards me over the
> past few months is that he is increasingly negative and I
> feel that I am being harassed, and that I am possibly being
> set up for termination. …. I do not feel that I am being
> heard, and that the expectation is not consistent.

*Id*. Nowhere in the email did plaintiff express that he believed Drella was harassing him because of his race. At his deposition, however, plaintiff testified that he believed Drella's harassment was race-based, Samuels Dep. at 262:14-18, and in his June 11, 2018, declaration, he states that he told Sheedlo as much during their February 19, 2014, phone call. Pl.'s L.R. 56.1 Stmt., Exh. 6 at ¶ 4.

Sheedlo denies that plaintiff ever complained of race-based harassment. She testified that the concerns plaintiff expressed in February of 2014 related to Drella's leadership and poor communication of his expectations. Sheedlo Dep., Pl.'s L.R. 56.1 Stmt., Exh. 7 at 44:11-46:8. Accordingly, while Sheedlo discussed plaintiff's concerns with Drella, she did not tell Drella that plaintiff had complained about being harassed because of his race. *Id*. at 46:10-13. *See also* Drella Dep. 69:1-3 (denying that Sheedlo told him plaintiff had complained about harassment).

On February 25, 2014, Drella talked to plaintiff about a performance improvement plan ("PIP"). The following day, plaintiff sent Drella an email stating,

> [Y]ou have no grounds to put me on a PIP…. This is not a
> performance issue on my part. I believe…that this is a
> direct result of my discussion with Angie Sheedlo
> expressing my concern about being harassed and expressing
> my feelings and my perception that my job was in jeopardy.

5

> If I am to be put on a PIP, my perception is that it would be due to retaliation for those actions.

Pl.'s L.R. 56.1 Stmt., Exh. J. Nothing in this email indicated that plaintiff had reported or discussed race-based harassment with Sheedlo.

Days later, while conducting a safety seminar at a local hotel the weekend of February 28-March 1, 2014, plaintiff injured his knee. He reported the injury to Drella on Sunday, March 2. Plaintiff did not return to work the following day, and he remained off work until May 6, 2014. During his absence, he submitted paperwork in conjunction with a workers' compensation claim. On March 7, 2014, Sheedlo and Drella called plaintiff to discuss his PIP, a paper copy of which he received in the mail a few days later.

While plaintiff was off work due to his knee injury, one of his subordinates, Pauletta Wood, approached Drella and expressed her concern that plaintiff had been keeping the company fuel card on his person. At her deposition, Wood explained that the fuel card had previously been accessible to employees at several different locations, but that at some point, plaintiff took control of the card and gave it to other employees only when they needed it to fuel the corporate van. Wood suspected that plaintiff was using the fuel card to fuel his personal vehicles. Wood Dep., Pl.'s L.R. 56.1 Stmt., Exh. 9 at 120:3-9.

Drella investigated Wood's concern by obtaining a report from Schneider's travel department that contained information about purchases made with the fuel card. Drella also spoke with other employees who used the card. Drella Dep. at 128:19-21. Drella analyzed the fuel report and discovered a number of purchases he found "unusual." For example, he identified "a series of purchases that seemed very unusual both in terms of the odometer reading, the date, time, so somewhere on a Saturday or a Sunday where the van shouldn't have been operating necessarily." *Id*. at 128:25-129:4. In addition, Drella noticed that purchases were made at a gas station located two miles from plaintiff's home, which was far from where the van normally operated. *Id*. at 129:11-20. Drella determined that none of the other employees responsible for fueling the training academy van lived near the location of these purchases. *Id*. at 129:21-130:8.

The fuel report also revealed an instance in which the fuel card had been used twice in the same day, at two different locations. According to Drella, because the combined fuel purchases on that day exceeded the capacity of the van's fuel tank, he concluded that "there was something - something that couldn't logically be rationalized there." *Id*. at 135:6-11. And on another occasion, the fuel card was used for a gas purchase at the gas station near plaintiff's home within four minutes of another gas purchase at the

same gas station on plaintiff's corporate American Express card. *Id*. at 133:4-17.

Drella shared his findings with his supervisor, Don Aiken, and with Sheedlo on or around March 28, 2014. Drella testified that at that time, he recommended confronting plaintiff with the evidence, and if plaintiff admitted to wrongdoing, he would be offered the opportunity to resign. If plaintiff denied misusing the fuel card, he would be placed on leave while defendant conducted additional investigations. Aiken and Sheedlo agreed with Drella's recommended approach. *Drella Dep*., 209:6-212:3.

Neither Drella nor Sheedlo told plaintiff during his work absence about Drella's investigation into his use of the fuel card, although they communicated with him about other matters and sent a PIP to his home. On April 28, 2014, plaintiff filed a charge of race discrimination and retaliation with the EEOC. The charge states:

> During my employment with Respondent I was subjected to a hostile work environment based on my race. I complained to respondent about the hostility toward me and immediately after I was placed on a Performance Improvement Plan.
>
> I believe that I have been discriminated against because of my race, and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Pl.'s L.R. 56.1 Stmt., Exh. 22.

Plaintiff was medically cleared to return to work on May 6, 2014. Upon learning of plaintiff's imminent return, Sheedlo and Drella referred the fuel card investigation to defendant's Corporate

Security Manager, Terry Wood, who engaged an outside investigator to interview plaintiff about the matters Drella uncovered in his investigation. Wood requested that the outside investigator be armed during the interview and stated that the agent's "primary mission" was "to interview/integrate (sic) for a signed confession." Pl.'s L.R. 56.1 Stmt., Exh. 16.

Upon his return to work, plaintiff was questioned by investigator Michael Quiroz about his use of the fuel and American Express cards. During the interview, which Sheedlo also attended, plaintiff admitted that he had used the fuel card to fill up his own vehicle; that he might have done so at the gas station two miles from his home; and that no one had authorized him to do so. Sheedlo Decl., Def.'s L.R. 56.1 Stmt., Exh. A (including exhibits).[2] Plaintiff also admitted that he had a balance on the American Express card that included charges for personal expenses, which he understood were his responsibility. Samuels Dep., 121:16-19, 124:14-19.

Quiroz then offered plaintiff an opportunity to resign his employment. In plaintiff's words, Quiroz told him, "if I agreed to

---

[2] In his L.R. 56.1(b)(3) responses, plaintiff "moves to strike" Sheedlo's declaration to the extent it relies on her handwritten and typed notes that are attached as exhibits to her declaration. Setting aside that L.R. 56.1 statements are not appropriate vehicles for moving for relief, plaintiff's hearsay objection is unpersuasive in view of Sheedlo's sworn statement that she: took the handwritten notes contemporaneously with the interview; transcribed, signed and dated them the same day pursuant to her usual practice; and retained them in the regular course of her business duties for defendant. *See* Fed. R. Evid. 803(6).

resigning…they would allow me to resign and they would have all this taken care of, Schneider would pay for whatever I owed and that would be it. If not, then they would press criminal charges on me." *Id*. at 125:19-22. Plaintiff did not believe he was being terminated for misuse of the corporate gas card; instead, he believed that if he didn't resign, he would be arrested and prosecuted. *Id*. at 126:2-5; 129:4-5. Plaintiff testified that he could have resolved any issues surrounding his use of the fuel and American Express cards by "talk[ing] to somebody," but that Quiroz left him with "no choice" but to sign the resignation agreement. *Id*. at 126:23-127:3. Plaintiff signed the resignation letter, and this lawsuit followed.

II.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To determine if that is the case, I must, wherever reasonable, construe all factual disputes and draw all inferences in the non-movant's favor. *Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 895 (7th Cir. 2016). If a fair-minded jury reviewing the evidence could return a verdict for the non-movant, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Title VII prohibits discrimination against an employee on the basis of race, among other characteristics, with respect to the

material terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a). In this case, plaintiff presses a disparate treatment theory of discrimination, arguing that he was forced to resign, and that he suffered other adverse employment actions, because of his race.[3] He articulates a laundry list of putative adverse actions: 1) his placement on a PIP; 2) a diminution of his job responsibilities; 3) defendant's efforts to obtain evidence from the hotel where he injured his knee; 4) defendant's dispute of his workers' compensation claim; 5) defendant's denial of a portion of a claim he submitted for reimbursement of certain business expenses; and 6) his forced termination.

Two of the items on this list—the diminution of plaintiff's responsibilities and defendant's challenge of his workers' compensation claim—do not require analysis because plaintiff cites no competent evidence suggesting that defendant actually took either action. Two others—plaintiff's placement on a PIP and the denial of

---

[3] Although plaintiff's EEOC charge alleged "a hostile work environment based on [plaintiff's] race," and both the complaint and the record refer to race-based "harassment," it is clear from plaintiff's argument that he is not relying on a hostile work environment/harassment theory of Title VII liability. Indeed, plaintiff does not identify the standard that applies to such claims or argue that his evidence satisfies it. *See Cole v. Board of Trustees of Northern Illinois University*, 838 F.3d 888, 895-96 (7th Cir. 2016) (harassment claims require evidence that: 1) the employee was subject to harassment; 2) the harassment was race-based; 3) the harassment was so severe or pervasive as to alter the conditions of the employee's work environment; and 4) there is a basis for employer liability). At all events, my review of the evidence confirms that plaintiff is not entitled to a trial on this theory.

his claim for business expenses—do not support his discrimination claim because the record does not reasonably suggest that either action effectuated a material change in the terms, conditions, or privileges of his employment. *Langenback v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (implementation of a PIP is not a materially adverse action); *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 603 (7th Cir. 2001) (refusal to reimburse business expenses incurred to attend a seminar not an adverse employment action). As for defendant's efforts to obtain evidence relevant to his workers' compensation claim, plaintiff fails to explain how defendant's conduct was inappropriate.

This leaves only plaintiff's coerced resignation. Although defendant disputes that its resign-or-we-press-charges ultimatum amounted to a constructive discharge, a jury could reasonably conclude that defendant's approach communicated to plaintiff that his termination was imminent. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (constructive discharge occurs when employer acts in a manner that would communicate to a reasonable employee that he will be terminated). Where plaintiff's claim loses traction, however, is on the absence of any evidence that Drella— the undisputed decisionmaker—coerced plaintiff's resignation *because of plaintiff's race*. Plaintiff does not assert that Drella ever used a racial epithet, expressed racial prejudice, or made any race-based remark to him or to anyone else. Plaintiff makes passing reference

12

to racially offensive comments that he attributes to an employee named Bill Bone, but he does not suggest that Bone had any involvement in the fuel card investigation or in his forced termination. Indeed, plaintiff suggests no link at all between Bone's comments and any adverse action he claims to have suffered.

And while plaintiff argues that similarly situated, non-African American employees were treated better than he was, the record does not support that contention. Plaintiff does not identify any other employee investigated for misuse of corporate funds who remains employed by defendant. Nor does he offer evidence that any other employee used the fuel card in the manner he admitted to using it himself, or who carried a balance on his corporate American Express card after receiving reimbursement for the business expenses charged to the card.[4] Plaintiff's comparator analysis rests on the vague assertion the Caucasian employee who preceded him as the Chicago safety manager was promoted, not forced to resign, even though he

---

[4] Plaintiff urges me to strike the fuel reports and "all evidence concerning [plaintiff's] fuel purchases" as hearsay and as a sanction for defendant's failure to preserve receipts that would have provided more specific information about the fuel purchases. These objections lack merit, however, because my analysis does not turn on whether the information contained in the fuel reports was either accurate or sufficient to establish misconduct by plaintiff. Drella testified that he interpreted the reports as suggesting possible misconduct, and as discussed above, plaintiff offers no evidence to suggest that Drella conducted his review in bad faith, i.e., as a pretext for discrimination. *See Johnson v. Hondo, Inc.*, 125 F.3d 408, 415 (7th Cir. 1997) ("Title VII does not prohibit unfairness or wrongheaded decisions in the workplace.") (citing cases).

"used his American Express card for personal matters and had issues with safety in the same Chicago market." But this cursory treatment of the issue falls far short of establishing a triable claim of disparate treatment. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir 2012) ("Similarly situated employees must be directly comparable to the plaintiff in all material respects.") (internal quotation marks and citations omitted). At all events, the undisputed evidence shows that plaintiff was not forced to resign because he used the American Express card for personal expenses or failed to improve defendant's safety results, but because, in addition to using the fuel card in an unauthorized manner, he failed to "pay for [his] share" of the monthly American Express charges—which he acknowledges he was expected to do. *See* Drella Dep. at 163:5-164:3; Samuels Dep. at 47:25-48:13.

Even assuming that plaintiff genuinely believed that his use of the cards was appropriate, his subjective view of his own conduct does not, without more, raise an inference of discrimination. *Pilditch v. Board of Educ. of City of Chicago*. 3 F.3d 1113, 1119 (7th Cir. 1993). Yet the record contains nothing but plaintiff's own speculation to suggest that racial animus motivated the challenged actions. Asked why he believed Drella was harassing him based on his race, plaintiff responded:

> I just felt that there was a difference between me and my peers.….[I]t just didn't feel right. I felt like it had to do with me, maybe the color of my skin, maybe it's – it

14

>had to have been something different. I just didn't know what else to point my finger to because he didn't show me anything else different that I could look at and say he does that with everybody. It was more every time he spoke to me it felt like he was uncomfortable with me. I don't know if I could say he just didn't like me. I could tell it was something to do with me, physically dealing with me."

*Id*. at 262:20-263:9. In essence, plaintiff surmises that Drella's ongoing criticism of his work—which plaintiff felt was unjustified—must have been based on his race. But "[m]ere subjective beliefs by the plaintiff—without the backing of hard evidence—cannot prove that an action was inspired by improper motivations." *Pilditch* 3 F.3d at 1119. Absent concrete "evidence of disparate treatment based on race," no reasonable jury could conclude that plaintiff was subject to race discrimination. *Cole*, 838 F.3d at 901.

Plaintiff's retaliation claim under Title VII fares no better. Plaintiff's central theory is that Drella retaliated against him after he complained to Sheedlo on February 19 and 20, 2014. But this theory falters at the gate because the record does not support the inference that plaintiff's complaints to Sheedlo amounted to protected activity. To be protected under Title VII, a complaint "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class…. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Orton-Bell v. Indiana*, 759

15

F.3d 768, 776 (7th Cir. 2014) (ellipses in original) (citations omitted). At his 2016 deposition, plaintiff testified that he did not recall what was said in his telephone conversation with Sheedlo, but that his email to her the following day—which said nothing about *race-based* harassment—accurately summarized their conversation. While plaintiff reversed course in his 2018 declaration, stating affirmatively that he *did* tell Sheedlo that Drella was harassing him based on his race, that statement directly contradicts his earlier testimony and cannot, standing alone, create a genuine factual dispute. *See Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002) (a party "may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits"). At all events, even if I accept plaintiff's later statement, there is no evidence that Sheedlo told *Drella*—the undisputed author of the alleged retaliation—that plaintiff had complained about race-based harassment. Accordingly, plaintiff cannot establish the required "causal link" between his complaints and the claimed retaliation. *Hamer v. Neighborhood Housing Services of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018) ("[t]o retaliate against a complainant, decisionmakers must be aware of the complaint.").

The same deficiency undermines plaintiff's half-hearted argument that defendant retaliated against him for filing a charge of discrimination with the EEOC on April 28, 2014. While the filing of that charge undeniably qualifies as protected activity, most of

16

the conduct plaintiff claims was retaliatory occurred *before* he filed the charge. Indeed, only his resignation occurred later. Plaintiff insists that because defendant "never produced its copy of the EEOC charge," a jury could conclude that defendant knew about the charge "earlier" than May 5, 2014, when Sheedlo referenced it in a communication with Quiroz. But it is hard to see what plaintiff gains from that inference, since Drella had undisputedly decided by late March—long before plaintiff filed the EEOC charge—that if plaintiff admitted to misusing the fuel card, he would be forced either to resign or face additional investigation. The sequence of events simply does not add up to an inference of retaliation based on plaintiff's filing of the EEOC charge.

This leaves only plaintiff's state law claim for retaliatory discharge. Having determined that summary judgment of plaintiff's federal claims is appropriate, however, I decline to exercise supplemental jurisdiction to decide this claim.

### III.

For the foregoing reasons, defendant's motion for summary judgment is granted.

**ENTER ORDER:**

*[signature: Elaine E. Bucklo]*

                       **Elaine E. Bucklo**
                      United States District Judge

Dated: September 24, 2018